IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 11, 2017 Session

## MICHAEL PRESSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-15-318     Roy B. Morgan, Jr., Judge**

_____

### No. W2016-01237-CCA-R3-PC

_____

The Petitioner, Michael Presson, appeals from the Madison County Circuit Court's denial of his petition for post-conviction relief. The Petitioner contends (1) that trial counsel was ineffective for failing to present an "economic motive" defense and failing to call witnesses at trial to support that defense; (2) that trial counsel was ineffective by failing to request a severance for charges that involved two separate victims; (3) that trial counsel was ineffective in failing to challenge certain jurors during voir dire; (4) that trial counsel was ineffective by failing "to call" the Petitioner as a witness at trial; (5) that trial counsel was ineffective for failing to object to the State's references to the term "pedophile" and to pornography during its closing argument; (6) that the trial court erred by failing to instruct the jury on certain lesser-included offenses and that trial counsel was ineffective in failing to request such instructions; (7) that trial counsel "was ineffective for failing to request that the trial court require the State to make an election of offenses" and "by failing to object to the trial court judge's election of offenses"; and (8) that post-conviction relief is warranted due to cumulative error.[1] Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

William D. Massey and Chelsea A. Harris, Memphis, Tennessee, for the appellant, Michael Presson.

_____

[1] For the sake of clarity, we have reordered and renumbered the issues from how they appear in the Petitioner's brief.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Alfred Lynn Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

**I. Procedural History**

In April 2010, the Petitioner was indicted for numerous offenses involving two victims, T.B. and S.W.[2] State v. Michael Presson, No. W2012-00023-CCA-R3-CD, 2014 WL 1669860, at *1 (Tenn. Crim. App. Apr. 24, 2014), perm. app. denied (Tenn. Nov. 10, 2014). With respect to T.B., the Petitioner was indicted "for twenty-two counts of aggravated sexual battery, sixteen counts of rape of a child, two counts of sale, loan or exhibition of material harmful to minors, and one count of indecent exposure." Id. With respect to S.W., the Petitioner was indicted for "three counts of sexual battery." Id.

Following a jury trial, the Petitioner was convicted of "ten counts of [the lesser-included offense of] attempted aggravated sexual battery, eleven counts of rape of a child, and one count of aggravated sexual battery," all with respect to T.B. Presson, 2014 WL 1669860, at *9. The Petitioner "was acquitted of all counts in the indictment pertaining to S.W.," as well as "five counts of rape of a child, eleven counts of aggravated sexual battery, two counts of sale, loan or exhibition of material harmful to minors, and one count of indecent exposure . . . [, all] pertaining to T.B." Id. at *9 n.2. The trial court imposed a total effective sentence of thirty-five years. Id. at *10.

This court affirmed the Petitioner's convictions and sentences on direct appeal. Presson, 2014 WL 1669860, at *1. On November 10, 2014, our supreme court declined to review that decision. On November 6, 2015, the Petitioner, through counsel, filed a timely petition for post-conviction relief. Two amended petitions were subsequently filed on the Petitioner's behalf.[3] Following an evidentiary hearing, the post-conviction court entered a written order denying post-conviction relief on June 3, 2016.

**II. Trial Facts**

T.B. testified at trial that she met the Petitioner "the summer before her seventh grade year in school." Presson, 2014 WL 1669860, at *2. T.B.'s mother "had worked

---

[2] It is the policy of this court to refer to minors, as well as victims of sexual offenses, by their initials.

[3] This opinion will only address the factual and procedural background regarding the issues raised in the Petitioner's appellate brief.

for the [Petitioner]" and he was considered "a family friend." Id. T.B. even "referred to the [Petitioner] as 'granddad.'" Id. at *5. T.B. testified "that she used to see the [Petitioner] 'a lot.'" Id. at *2. T.B. explained that the Petitioner would "occasionally" pick her up from school, that "she and the [Petitioner] would go out to eat together," that they would "go hunting together," and that "she would 'stay the night' at his house." Id. "T.B. estimated that she spent the night at the [Petitioner's] house 'over a hundred' times" and testified that "she had full access to the house" and "was 'real familiar' with the inside" of the house. Id. at *2, 5.

T.B. described what would typically happen when she spent the night at the Petitioner's house as follows:

> T.B. testified that she would normally go to the [Petitioner's] house on a Friday night, and he would "give [her] a bath," and she "would have to sleep in the bed with [the Petitioner]." When giving her a bath, the [Petitioner] would "wash [her] with a wash rag" on her "breasts and [her] private area." T.B. indicated to the jury that her "private area" was her genital area. When asked how the [Petitioner] would wash her genital area, T.B. responded "[h]e wouldn't go inside the hole [of the vagina]; he would go like on the inside of like the walls" and stated she was referring to the vaginal lips. T.B. stated that after the [Petitioner] washed her, they would go lay in bed together, and that the [Petitioner] would use a razor to shave her legs and her private area. She recalled that the [Petitioner] told her that shaving would prevent her from "getting an infection."

> T.B. testified that she slept in the same bed as the [Petitioner]. She stated that the [Petitioner] gave her a shirt cut off above her waist to wear and that he would wear underwear. She recalled that there were two bedrooms in the house, but that she slept in his room because he told her there had been "break-ins" in the neighborhood. T.B. stated that, while lying in bed, the [Petitioner] would "wrap his arm around [her]," and he would touch her breasts.

Presson, 2014 WL 1669860, at *2 ("Defendant" altered to "Petitioner"; all other alterations in original).

T.B. testified that incidents similar to what were described above occurred sixteen times between August 2007 and March 2009. Presson, 2014 WL 1669860, at *2. T.B. also testified about an incident when the Petitioner "showed her Playboy magazines and a vibrator." Id. at *3. T.B. recalled that the Petitioner "had the Playboy magazines on his headboard by his bed" and that "he pulled the vibrator out of a dresser drawer and asked [her] if she wanted to see it." Id. T.B. testified about another incident when the

-3-

Petitioner "put his lips on her buttocks to suck out a bee sting." Id. at *3, 5. T.B. further testified that the Petitioner showed her "a pornography [television] channel" while she and the Petitioner were at a cabin belonging to one of the Petitioner's friends. Id. at *3.

T.B. claimed "that she did not tell anyone about the incidents until she told her mother the summer before her eighth grade year." Presson, 2014 WL 1669860, at *3. T.B. recalled that after she told her mother, "they went over to S.W.'s house and talked to a law enforcement officer." Id. at *4. T.B. then gave statements to an investigator on July 29, 2009, and August 1, 2009. Id. T.B. testified that she told her mother because she knew the Petitioner would "begin picking her up from school again" when the school year started and that "she 'didn't want to be around him anymore.'" Id. at *3.

T.B. testified that "during her seventh grade year," she told her boyfriend that "she 'had been touched by somebody.'" Presson, 2014 WL 1669860, at *3. T.B.'s boyfriend "told his mother, who went to [T.B's] principal." Id. T.B. told her principal that "a person named 'Daniel' had raped her, but [she claimed] it was a 'random' name she had picked 'out of the air.'" Id. at *4. T.B. eventually told her principal "that she had '[done] this to get attention and sympathy'" and that she "'was fine about it so that everything would be dropped'" and she "'wouldn't get in any trouble.'" Id. at *3-4 (alteration in original).

T.B. admitted that she told the investigator that the Petitioner "did not 'try to put his finger or anything else inside of [her].'" Presson, 2014 WL 1669860, at *4 (alteration in original). T.B. explained that she was confused when she spoke to the investigator and that she did not realize that penetration included the Petitioner's having "put his fingers 'inside the lip [of her vagina]'" because "the genital area was hard for a twelve-year-old to understand and describe." Id. (alteration in original). T.B. also admitted that prior to having come "forward with her allegations against the [Petitioner]," she told a doctor in April 2009 that "she was not 'active sexually.'" Id. at *5.

T.B. admitted to an incident when she threw her cell phone "across the room" at the Petitioner's house. Presson, 2014 WL 1669860, at *3. T.B. testified that she was "grounded for the summer" because of the incident, that she had her cell phone "taken away," and that she had "to forego a concert she wanted to attend." Id. at *5. T.B. further testified that "it was within one or two days of being grounded . . . that she told her mother about the incidents involving physical contact with the [Petitioner]." Id.

During a search of the Petitioner's home, police officers found "a vibrator, a white shirt that had cutoff sleeves and was cutoff on the bottom, some Playboy magazines, three blue disposable razors, [and] an electric razor." Presson, 2014 WL 1669860, at *6. The vibrator and the t-shirt "were found in a dresser near the master bedroom." Id. The Playboy magazines "were found in the headboard of the bed in the master bedroom." Id.

-4-

On the whole, the items seized during the search "were found in places T.B. had indicated" in her statements to the investigator. Id. Subsequent forensic testing revealed "a DNA profile partially matching that of T.B.'s" on one of the disposable razors seized from the Petitioner's house. Id. at *7.

Dr. Lisa Piercy, "a child abuse pediatrician" who "worked primarily at the Child Advocacy Center in Jackson, Tennessee," testified that she interviewed and examined T.B. Presson, 2014 WL 1669860, at *6. When asked about what had occurred with T.B.'s principal, Dr. Piercy responded "that T.B.'s accusation of rape and the subsequent recant was consistent with the behavior of a sexually abused child." Id. Dr. Piercy testified that T.B. had previously been diagnosed with "oppositional defiant disorder ('ODD')" and that it was "'possible' for a child with ODD to falsely accuse someone of rape." Id. at *6-7. However, Dr. Piercy also testified that "she had seen children who had been sexually abused display behaviors consistent with those attributed to ODD." Id. at *7.

The Petitioner's friend who owned the cabin where T.B. claimed that the Petitioner had shown her a pornographic television channel testified that the channel was "'supposed to be locked out.'" Presson, 2014 WL 1669860, at *7. He further testified that, when he arrived at the cabin, the Petitioner "was unloading groceries" and the television was not on the pornographic channel. Id. Another of the Petitioner's friends testified to contradict S.W.'s allegations. Id.

The Petitioner called T.B.'s boyfriend and the principal of her school as witnesses. Presson, 2014 WL 1669860, at *7. T.B.'s boyfriend testified that she told him "she had been raped by someone at school," but "then changed her story and said it was the [Petitioner]" after their principal was told about the allegation. Id. T.B.'s boyfriend recalled that he "showed the principal [the] picture in the yearbook" of "the student that T.B. had originally identified as the person who raped her." Id. T.B.'s boyfriend further testified "she was '[n]ot that truthful really.'" Id. (alteration in original). The principal testified that when he questioned T.B. about the allegation, she "admitted that she had 'made the story up.'" Id. He further testified that "based on his dealings with T.B., he would 'not trust her with the allegations without following up extensively.'" Id.

The Petitioner also called Dr. Tara Pedigo, a pediatrician who had examined the victim in April 2009. Presson, 2014 WL 1669860, at *8. Dr. Pedigo testified that T.B. "'denie[d] sexual activity of any kind'" during the examination. Id. Dr. Pedigo further testified that T.B. "was taking Zoloft for depression and ODD," but that T.B.'s mother stated that "the treatments were not working." Id.

Additionally, the Petitioner called Dr. Robert Kennon, a licensed psychologist, to testify "as an expert witness in the field of forensic psychology." Presson, 2014 WL

-5-

1669860, at *8. Dr. Kennon opined that "he had seen a lot of false reports of [sexual] abuse" and that such false reports were "often made to 'gain an advantage.'" Id. With respect to T.B.:

> Dr. Kennon testified that he was in the courtroom when the victims testified, and he stated that, while he did not evaluate T.B. personally, the diagnosis for a child with ODD is the opposite diagnosis to that of a child who has been sexually abused. He stated that T.B.'s testimony lacked detail and that she did not testify to several of the factors related to sexual abuse. He stated that her responses sounded "rote" and "repetitious" and lacked the detail he would expect to hear from an abuse victim.

Id. Dr. Kennon further testified that "it would be 'odd' for [a sexual] abuser to [] give a house key to the parent of a victim." Id. However, Dr. Kennon admitted that it was possible for details to "'blur together'" when a child had been "'repetitiously abused'" and that "it would be important for an abuser to win trust with a victim or the victim's parents" to gain "access to the child." Id. at *8-9.

### III. Post-Conviction Hearing

### A. Trial Counsel

Trial counsel's testimony was the primary focus of the post-conviction hearing. Trial counsel testified that he was retained to represent the Petitioner at trial and that the Petitioner also retained an outside investigative firm, Inquisitor, Inc., to investigate the allegations and to serve as "a jury consultant." Trial counsel further testified that he filed "numerous" pretrial motions and that the trial court granted "every pretrial motion" he filed. Trial counsel recalled that he "got along great" with the Petitioner and that the outcome of the trial "made [him] sick." But trial counsel stated that he "did everything [he] could think to do" in representing the Petitioner, and he could not "find anything [he] did" that was ineffective or contributed to the Petitioner's convictions.

The bulk of trial counsel's testimony was spent discussing the possibility of an "economic motive" defense. Trial counsel explained that T.B.'s mother, Latosha D.,[4] "was a part-time bookkeeper" for the Petitioner. The Petitioner believed that Ms. D. "had misappropriated . . . [or] had made charges on a company credit card that he hadn't authorized." Trial counsel thought that the Petitioner was not "even aware" of the alleged fraudulent charges until after he was arrested because the Petitioner was "the type of person that if he hired you to do something, he expect[ed] you to do it." Therefore,

---

[4] To further protect the victim's privacy, we will refer to the victim's mother with only the first initial of her last name.

-6-

their theory was that Ms. D. "[p]reemptively" encouraged T.B. to make false allegations against the Petitioner to protect Ms. D. from being prosecuted for fraudulent charges that the Petitioner had yet to discover.

For context, trial counsel testified that the Petitioner's wife had taken care of the "bookkeeping" for the Petitioner's sporting goods store until her death. Ms. D. took over that role after the death of the Petitioner's wife. Trial counsel testified that this role gave Ms. D. "[u]nfettered" access to the check book, credit card, and financial documents for the Petitioner's store. At some point, one of the Petitioner's employees told the Petitioner that he was concerned that "the bills weren't being paid" because "creditors were calling the business" and Ms. D. was "flippant" when the employee "fuss[ed] at her about it." According to trial counsel, Ms. D. "took the books to her home" after the Petitioner spoke to her about the issue, and she did not return them until after the Petitioner was arrested.

Trial counsel testified that Ms. D. also had a key to the Petitioner's house. Trial counsel recalled that Ms. D, Ms. D.'s mother, and T.B. "went in [the Petitioner's] house and looked all around" the weekend before T.B.'s allegations were reported to the police. Trial counsel conceded that it was a "[f]air inference" that they "were looking for something to use against [the Petitioner] before [the] allegations were ever made." Trial counsel believed that he cross-examined T.B. about the fact that she had a key to the Petitioner's home. Trial counsel recalled that when Ms. D. returned the Petitioner's "books" and the key to his home, she also returned a second business credit card with her name on it. The Petitioner told trial counsel that the second credit card was "[n]ot authorized."

Regarding the Petitioner's arrest, trial counsel testified that S.W.'s stepfather was an officer with the Jackson Police Department (JPD). According to the police report, Ms. D. and T.B. were at S.W.'s house "when the allegations were first" reported to the police. Trial counsel also noted that during one of her statements, T.B. told the investigator that S.W.'s stepfather told Ms. D. to bring "everything to the Sheriff's office, so [the Petitioner] couldn't say that [they] ran up $2,000 worth of stuff on a credit card," but that the Sheriff's deputies "didn't take it." Trial counsel testified that he believed T.B. was referring to the Petitioner's credit card, checkbook, and other financial documents. Trial counsel recalled that he cross-examined both the investigator and T.B. about that statement.

Trial counsel testified that the Petitioner reviewed his credit card statements after his arrest and discovered numerous charges "that had absolutely nothing to do with [his] business." These included charges for Walmart, Walgreens, various utility providers that served Ms. D.'s home, and various gas stations, hotels, restaurants, and bars. The Petitioner contacted his bank and had Ms. D. removed as an "authorized user" on his account. However, the bank denied the Petitioner's fraud claim because Ms. D. had been

an authorized user on the account, and "they couldn't show by clear evidence that . . . she was committing [] fraud." Put another way, the bank's response was that it was not "going to discern between what was authorized and what was not if [Ms. D.] had authorization to use . . . the card."

The Petitioner met with his accountant, Ronnie Clay, and they compiled a list of questionable charges. Trial counsel testified that he called Mr. Clay as a witness at the preliminary hearing. Trial counsel further testified that he advised the Petitioner that "if [they] were going to proceed with [the economic motivation] theory of the defense . . . that [they] had to vet [the list of] charges and make absolutely sure that . . . none of those charges had been authorized." After the Petitioner "said he had been over [the list] with Mr. Clay," trial counsel forwarded the list to a JPD investigator in hopes of having Ms. D. prosecuted "for those unauthorized charges." Trial counsel also brought up with the investigator T.B.'s statement during her interview about running up charges on the credit card and the fact that an "unauthorized" second card with Ms. D.'s name on it had been issued.

However, the investigator found "five to eight charges" that he "was able to establish were authorized by [the Petitioner]." One of the alleged fraudulent charges, a sponsorship for one of T.B.'s cheerleading events, had been deducted as a business expense on the Petitioner's income tax return. Trial counsel believed that Ms. D. had also provided the investigator with "some explanation . . . that really unraveled . . . some of the allegations [the Petitioner] was making about [the charges] not being authorized." Specifically, trial counsel believed that Ms. D. had told the investigator that the Petitioner allowed her to make personal charges on the credit card in lieu of paying her for her bookkeeping services. Additionally, there was a witness who told the investigator that the Petitioner had encouraged Ms. D. to use the credit card "to get more points toward a vacation." Trial counsel believed that this witness was a friend of Ms. D.'s. Trial counsel testified that he did not think the JPD's investigation into the Petitioner's allegations against Ms. D. was "fair."

Trial counsel testified that the "economic motive" defense "fell by the wayside" once the JPD completed its investigation. According to trial counsel, the JPD investigator threatened to charge the Petitioner "for filing a false police report" if they "proceeded" with the matter. Additionally, trial counsel worried that the fact that the Petitioner had actually authorized some of the charges on the list of questionable charges would significantly weaken the "economic motive" defense "if presented to . . . the jury" and that the State would use the list "against" the Petitioner to challenge his credibility. As trial counsel put it, using the "economic motive" defense at trial would have meant that there was "a sideshow going on as to [the Petitioner's] credibility that[ was] going to affect the main show." Trial counsel also thought that the fact that one of the alleged

fraudulent charges had actually been used by the Petitioner as an income tax deduction was particularly damning and could have exposed the Petitioner to "federal [criminal] problems." Trial counsel further noted that the Petitioner never explained to him how Ms. D. was paid for her bookkeeping services.

Rather than use the "economic motive" defense, trial counsel chose to focus on the victims' credibility. Trial counsel testified that he "knew [they] could prove that nothing had happened to" S.W. and that they "could discredit" T.B. To that end, trial counsel convinced the trial court to conduct an in camera inspection of the victims' medical records. Trial counsel learned that T.B. had previously "falsely accused [another] student . . . of rape." Trial counsel thought that T.B.'s having made "a false allegation against a student she didn't know of rape would [have been] very substantial to the jury." Trial counsel testified that he argued that T.B. was a liar during the trial, that he called witnesses about T.B.'s prior rape accusation, and that he was "probably too forcefully" in attacking T.B.'s credibility during his cross-examination of her.

Trial counsel opined that the "economic motive" defense would have been "an excellent argument" to present to the jury. Trial counsel said that, in hindsight, he felt that their inability to use the "economic motive" defense was what "ultimately convicted" the Petitioner. However, trial counsel testified that everyone involved in the defense, including the Petitioner, agreed that they "could not" use the "economic motive" defense at trial.

Likewise, trial counsel testified that he discussed with the Petitioner the issue of whether to seek a severance of the charges involving T.B. and S.W. Trial counsel felt confident that the Petitioner would be acquitted of the charges involving S.W. because S.W.'s allegations were "just really preposterous," but he worried that they would have trouble rebutting T.B.'s allegations because "there were such a huge amount of allegations." Trial counsel thought that by trying the cases together, he would be able "to taint the State's strongest case with . . . [its] weakest case." Trial counsel testified that there were "things in [S.W.'s] case that [he] felt gave strength to [their] defense."

Trial counsel explained that he felt S.W. had falsely accused the Petitioner because of "psychological issues" and that S.W.'s allegations were a "copycat" of T.B.'s allegations so that S.W. could "be the center of attention." Trial counsel recalled that the victims were friends, that they were both "interested" in the Petitioner's grandson, and that they both made their allegations at the same time. Trial counsel also noted that there were changes between S.W.'s first statement to the police and her second statement, which was then more similar to T.B.'s statement. On the whole, trial counsel felt that "the positive aspect[s]" of trying the cases together "outweighed the negative aspect[s] of not severing" due to the stronger proof rebutting S.W.'s allegations. Additionally, trial

counsel noted that getting "it all over [with] at once" "was a factor, not the factor but a factor," in his decision not to seek a severance.

Trial counsel testified that it was uncommon for jury questionnaires to be used "in a rape trial," but the trial court allowed a questionnaire to be used in this case. Trial counsel further testified that the questionnaire was "vital" for gaining information on the prospective jurors. Trial counsel explained that he and the jury consultant ranked the prospective jurors based upon their answers to the questionnaire. Trial counsel admitted that there were no men on the jury, but noted that all of the potential male jurors challenged by the State had been "ranked at the bottom" of his list of potential jurors.

Trial counsel was then asked about three specific jurors. Two of the jurors had made donations to the "Carl Perkins Center" (CPC). Trial counsel admitted that one of the expert witnesses had "an affiliation" with the CPC. However, trial counsel testified that the CPC was a popular charity in Jackson and that it dealt with both sexual and "non-sexual" child abuse. Trial counsel believed that the CPC donations were "covered [] in voir dire." The jurors appealed to trial counsel due to "other factors," and he believed that their "positives would have outranked [the] negatives" of their having donated to the CPC.

The third juror was the foreperson and had a relative who had "allegedly been molested." Trial counsel testified that by the time this juror had been added to the panel, he only had one challenge left. Trial counsel explained that it was his practice not to "shoot [his] last bullet" and use his last remaining challenge. Trial counsel further explained that he was saving his last challenge in case someone he viewed as a worse potential juror was placed on the panel. Trial counsel also noted that the juror was asked about the situation with her relative during voir dire and stated that it would not affect her impartiality.

Trial counsel testified that he discussed the issue of the Petitioner's testifying at trial with the Petitioner "on various occasions" and that the Petitioner chose not to testify. According to trial counsel, he spoke with the Petitioner "from very early on" and "many times" about the possibility of testifying at trial. Trial counsel recalled that he advised the Petitioner that he could testify if he wanted to, but that it was "going to take many hours of preparation" and was not something he should "do just spontaneously." Trial counsel also recalled that the jury consultant spoke with the Petitioner about the possibility of his testifying at trial.

Trial counsel testified that he did not attempt to "dissuade [the Petitioner] from testifying," but that he did not think it was a good idea for the Petitioner to testify. Trial counsel explained that he felt this way because "there were so many charges alleged on days [the Petitioner] didn't [recall] where he was." According to trial counsel, the

-10-

Petitioner "declined" his pretrial offer to prepare him to testify at trial. Trial counsel testified that he asked the Petitioner again during the trial if he wanted to testify, and the Petitioner "declined."

Regarding the State's closing argument, trial counsel testified that he "did not feel the necessity" to object to the prosecutor's reference to Playboy magazines because he "didn't think it was prejudicial to [their] case and [he thought it] was relevant to what the State was trying to . . . establish, . . . [that T.B.] was familiar with [the Petitioner's] room." Trial counsel explained that prior to trial, he successfully moved the trial court to exclude "a large amount of pornography that was [found] in [the Petitioner's] storage room out in the back." Trial counsel further explained that the Playboy magazines referenced during the State's closing argument had been found in the Petitioner's bedroom and were used "to show [T.B.'s] familiarity with that room."

Initially, trial counsel testified that he had not noticed the use of the term "pedophile" during the State's closing argument and that he "should have" objected to it. Later, trial counsel recalled that he had asked one of the expert witnesses what research and expertise the expert had "regarding pedophiles." Trial counsel also recalled that there was evidence that the Petitioner would pick up T.B. from school and that T.B. referred to the Petitioner as "grandpa." Trial counsel further recalled that this evidence led to questioning of the expert witnesses on the issue of "grooming" and that was how "the whole issue of pedophilia came up."

Trial counsel admitted that he did not request that the trial court instruct the jury on certain misdemeanor lesser-included offenses. Trial counsel testified that "[t]here was no strategic reason" for his not requesting the instructions, but that he was focused on an "absolute outright win."

Trial counsel recalled that the trial court "required the State to make an election" of offenses. According to trial counsel, the trial court repeatedly admonished the State to make an election of offenses and the prosecutor "react[ed] as he was . . . obligated to do." Trial counsel further recalled that at the close of the State's proof, the trial court acquitted the Petitioner on multiple counts. Trial counsel testified that he "felt comfortable" with how the election of offenses was handled by the trial court.

**B. The Petitioner**

The Petitioner blamed his convictions on having "trust[ed] too much." The Petitioner claimed that T.B. had spent the night at his house with his wife a few times prior to his wife's death. According to the Petitioner, he was out of town on those occasions. The Petitioner testified that T.B. wanted to continue to spend the night at his house after his wife's death. The Petitioner stated that he initially refused to allow T.B.

to stay overnight because he knew "enough about the law that [he was] not gonna throw [his] life away or [his] retirement on some kid."

The Petitioner testified that he eventually relented and began letting T.B. spend the night at his house. However, the Petitioner denied that it occurred "on a regular basis." The Petitioner estimated that he would see T.B. "[m]aybe once a month." According to the Petitioner, Ms. D. would occasionally ask him to pick T.B. up from school because her school was close to the Petitioner's store. Additionally, the Petitioner testified that Ms. D. would ask the Petitioner to keep T.B. overnight when Ms. D. and her husband went out of town.

The Petitioner admitted that when T.B. spent the night at his house, she "slept either in [his] bed or in the recliner in the front living room." The Petitioner also admitted that T.B. kept clothes, including underwear, at his house and slept in a "cut-off [t]-shirt." The Petitioner claimed that his wife had given the t-shirt to T.B. The Petitioner denied shaving T.B. The Petitioner claimed that T.B. found his "wife's dildo" in his "wife's drawer," that he told her to put it back, and that he told Ms. D. about the incident. The Petitioner denied that T.B.'s clothes were kept in the same drawer as the "dildo." The Petitioner admitted that the police found a pornographic magazine titled Geezer Pleaser in his house, but the Petitioner claimed that it was not his and that he did not know how it got in his home.

Regarding the "economic motive" defense, the Petitioner testified that he owned a sporting goods store and that his wife kept the "books and records" for him until her death. The Petitioner could not recall what year his wife died. The Petitioner testified that after his wife's death, one of his customers suggested that he "ought to get [Ms. D.] to do [his] books." The Petitioner estimated that, at that point, he had known Ms. D. for about a year. The Petitioner testified that Ms. D. agreed to "take care of it" for him.

The Petitioner admitted that his arrangement with Ms. D. was not "in writing." The Petitioner claimed that he never paid Ms. D. for her bookkeeping services because "she never asked for any money." Instead, the Petitioner claimed that he would occasionally give Ms. D. "$25 or $50 or something or another like that." In addition to giving Ms. D. the checkbook, credit card, and financial documents for his store, the Petitioner also gave Ms. D. a key to his house. The Petitioner claimed that he gave Ms. D. the key so her family could "go swimming" and because he "didn't have anything really of value" in the house. The Petitioner further claimed that he gave Ms. D. the key because she would sometimes ask him if she could clean his house.

The Petitioner testified that he had a credit card with a $50,000 limit that he used to buy merchandise for his store. The Petitioner initially claimed that he never used the credit card for personal expenses. However, the Petitioner later admitted that he might

-12-

have used the card for hunting or fishing trips. The Petitioner admitted that he authorized Ms. D. to use the credit card, but he denied that he "authorized her to use it for personal expenses" like paying her utility bills. Instead, the Petitioner claimed that he told Ms. D. that the credit card "could only be used to pay [for] stuff for [his] shop."

The Petitioner estimated that his credit card bill was normally between $15,000 and $30,000 each month. The Petitioner testified that he met with Ms. D. monthly at his store to sign checks. According to the Petitioner, he would not sign a check until finding out what it was for. The Petitioner also testified that "the books" were kept at his store. However, the Petitioner claimed that after about a year, one of his employees complained that bills were not being paid on time. According to the Petitioner, he confronted Ms. D. about the issue, and she asked him if she could take "the books" home with her to "take care of it." The Petitioner testified that he allowed her to do so.

The Petitioner further claimed that Ms. D. would "come by and pick up the mail" at his store so that he never saw his credit card statements. Despite Ms. D.'s alleged fraudulent charges, the Petitioner testified that he never noticed an increase in the monthly credit card bill. According to the Petitioner, the bill was "always in the neighborhood of" $15,000 to $20,000 and that "sounded about right" to him and his employee.

The Petitioner claimed that the late payment of bills "deteriorated" after Ms. D. took "the books" home with her. According to the Petitioner, both he and Mr. Clay asked for Ms. D. to return the financial documents, but she refused to do so. The Petitioner claimed that he only got the items back after he was arrested. The Petitioner testified that when the items were returned, there was a second credit card with Ms. D.'s name on it that he had never seen before. According to the Petitioner, he was informed by his bank that Ms. D. had used the phone number for her primary job when she requested that a second card be issued. The Petitioner also claimed that he discovered after his arrest checks that Ms. D. had "forged."

The Petitioner denied knowing the witness who claimed that he overheard the Petitioner telling Ms. D. to use the credit card to earn points. The Petitioner denied ever telling Ms. D. that and claimed that he never used the points he had earned from the credit card. The Petitioner testified that he had mistakenly included a charge to PayPal on his list of questionable charges because he did not realize it had been used to pay for an alarm system for his store. The Petitioner claimed that the check used to pay for the cheerleading event sponsorship for T.B. had been forged and that he did not know that Mr. Clay had used that expense as a deduction on his income tax return.

The Petitioner testified that he believed Ms. D. "was trying to get [him] before [he] got to her" by having T.B. falsely accuse him of rape. The Petitioner claimed that

-13-

trial counsel originally "didn't want to look at" the "economic motive defense." The Petitioner further claimed that, once he convinced trial counsel to look into the matter, he pushed "[u]p until trial" for trial counsel to use the defense.

The Petitioner testified that he was "scared" at the prospect of testifying at trial, but that he would have if trial counsel wanted "to put [him] on the stand." The Petitioner stated that he had no prior criminal record. The Petitioner further stated that if he had testified at trial, he would have denied all of the allegations and would have testified that Ms. D. had been stealing from him. The Petitioner claimed that trial counsel stated that he was "not gonna put [the Petitioner] on the stand." Additionally, the Petitioner claimed that trial counsel did not discuss whether they should request a severance of the charges regrading T.B. and S.W. or whether to pursue any lesser-included offenses. The Petitioner also claimed that trial counsel never reviewed the jury questionnaire with him or consulted him during voir dire.

### C. Remaining Witnesses

The Petitioner's accountant, Ronnie Clay, testified that the Petitioner "was not a numbers man" and that the Petitioner's wife did the "bookkeeping" for the Petitioner's store until her death. Mr. Clay recalled that the Petitioner told him he had hired Ms. D. to do "his bookkeeping" and that if he "had any questions about any of the information to call her." According to Mr. Clay, Ms. D. did not provide him with information monthly, but it was more often than once a year.

Mr. Clay testified that the Petitioner did not use his business credit card for personal expenses. Mr. Clay further testified that he had not seen any of the alleged fraudulent charges prior to the Petitioner's discovery of them because the Petitioner had found them "midyear." Mr. Clay assisted the Petitioner in preparing a list of questionable charges based on the credit card statements the Petitioner provided him.

Regarding the charge that had been used as a deduction on the Petitioner's income tax return, Mr. Clay testified that he asked Ms. D. about the expense and that she told him it was an authorized business expense. Mr. Clay testified that he never spoke to the Petitioner about the expense and that, in general, he could not recall ever circumventing Ms. D. to ask the Petitioner about an expense. Mr. Clay also noted that the expense had been paid for with a check and that the handwriting on the check did not look like the Petitioner's.

Sherry Connolly testified that she was a friend of the Petitioner's wife. Ms. Connolly recalled that T.B. asked to stay at the Petitioner's house "quite often." Ms. Connolly testified that the "dildo" found in the Petitioner's bedroom had belonged to his wife. Ms. Connolly stated that she knew this because she was present when the

Petitioner's wife bought it. However, Ms. Connolly admitted that she "never saw [the dildo] after that" and that she had no idea what the Petitioner "might have done with it." Ms. Connolly also testified that she had never seen any pornography in the Petitioner's house. Ms. Connolly thought she would be called to testify at trial, but she was never subpoenaed.

One of the jurors testified that she and her husband donated $220 to the CPC annually. The juror testified that it was a family decision but that her husband did "it all."

### IV. Post-Conviction Court's Order

The post-conviction court denied the petition at the conclusion of the post-conviction hearing, and a written order outlining the post-conviction court's findings was entered on June 3, 2016. Prior to denying the petition, the post-conviction court clarified a statement from the trial transcript that it had "prepared an election of offenses." According to the post-conviction court, the State had made an election of offenses prior to the Petitioner's motion for judgment of acquittal. The post-conviction court explained that the statement from the trial transcript referred to the State's having submitted its election of offenses to be typed up for use in the jury instructions. The Petitioner's attorney conceded that "the election was made, at least it was charged to the jury."

In denying the petition, the post-conviction court accredited the testimony of trial counsel over the Petitioner's. Regarding the "economic motive" defense, the post-conviction court noted that it was "a possible defense." The post-conviction court found that trial counsel "thoroughly reviewed" the defense, "weighed the benefits of the defense versus the problems," and determined that it was best to pursue a different strategy after "problems arose" with the defense. The post-conviction court also noted that the Petitioner's testimony, specifically his testimony that Ms. D. was providing bookkeeping services to him for free, presented "a credibility issue" that weighed against using the "economic motive" defense.

The post-conviction court concluded that trial counsel had made reasonable strategic decisions in deciding not to seek a severance and in his handling of jury selection. Additionally, the post-conviction court concluded that trial counsel's advice that the Petitioner not testify at trial was a reasonable strategic decision and that the trial record reflected that it was the Petitioner's decision not to testify. Regarding the mention of the Playboy magazines and the use of the term "pedophile" during the State's closing argument, the post-conviction court found that these issues were fairly raised by the evidence at trial and that the Petitioner had failed to show he was prejudiced by trial counsel's lack of an objection.

With respect to the failure to request lesser-included offense instructions, the post-conviction court found that the evidence at trial did not support the instructions. The post-conviction court also concluded that "the jury never got past the indicted offense[s] or an attempt." The post-conviction court found the Petitioner's election of offenses issue to be "a claim without any merit." The post-conviction court also concluded that there was no cumulative error.

## ANALYSIS

### I. Post-Conviction Standard of Review

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In reviewing a trial counsel's conduct, we make every effort to "'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Felts v. State, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting Strickland, 466 U.S. at 689).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency."

-16-

Felts, 354 S.W.3d at 277 (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)). Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

## II. "Economic Motive" Defense

The Petitioner contends that trial counsel was ineffective for failing to present an "economic motive" defense and failing to call witnesses at trial to support that defense. The Petitioner argues that the "abandonment of a pre-established and sound defense" was ineffective assistance of counsel and deprived him "of a fair trial." The Petitioner further argues that there was significant evidence to support this theory and that "an all-female jury needed to hear why [the victims] would lie about so many sexual offenses." The Petitioner also argues that trial counsel's decision not to utilize the "economic motive" defense was based on his incorrect assumption that its use would risk the Petitioner's being charged with more criminal offenses. Additionally, the Petitioner contends that trial counsel should have called Mr. Clay and Ms. Connolly to testify at trial to support the "economic motive" defense.[5] The State responds that trial counsel made a reasonable strategic decision not to present the "economic motive" defense and supporting witnesses at trial.

There are "countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Felts, 354 S.W.3d at 277 (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted). As such, strategic decisions "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" on post-conviction review. Id. (quoting Strickland, 466 U.S. at 690) (internal quotation marks omitted). As previously stated, "[t]he fact that a particular strategy or tactical decision failed does not by itself establish deficiency." Felts, 354 S.W.3d at 277 (citing Goad, 938 S.W.2d at 369).

---

[5] The Petitioner also contends that trial counsel was ineffective for failing to call a witness, Janie Reed, to challenge S.W.'s credibility. However, Ms. Reed was not called as a witness at the post-conviction hearing; therefore, this claim is without merit. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (discussing the need to call witnesses at the post-conviction hearing in order to support a claim that trial counsel was ineffective for failing to present said witnesses at trial).

Here, the evidence at the post-conviction hearing established that trial counsel thoroughly investigated the "economic motive" defense. While the Petitioner's brief focuses on trial counsel's fear that the Petitioner would face criminal prosecution for "low-grade" criminal offenses as the reason for his decision not to pursue this defense, trial counsel testified repeatedly about his worry that it would harm the Petitioner's credibility with the jury. As trial counsel put it, he was concerned that using this defense would create "a sideshow" regarding the Petitioner's credibility that would "affect the main show." The post-conviction court noted that this was a reasonable concern given the Petitioner's testimony that he never paid Ms. D. for her bookkeeping services.

Rather than pursue the "economic motive" defense and expose the Petitioner to a likely damaging challenge to his credibility, trial counsel chose to focus on the victims' credibility. Trial counsel felt confident that he "could prove that nothing happened to" S.W., and the Petitioner was ultimately acquitted of those charges. Trial counsel also had evidence that he thought "could discredit" T.B. Trial counsel believed that T.B.'s having made "a false allegation against a student she didn't know of rape would [have been] very substantial to the jury." Again, the Petitioner was acquitted or found guilty of the lesser-include offense of attempt for several of the charges involving T.B.

The Petitioner relies on State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991), to support his argument that the "abandonment of a pre-established and sound defense" amounted to ineffective assistance of counsel. However, Zimmerman is inapplicable to this case because the defense strategy at issue in Zimmerman was abandoned mid-trial after the jury had already been told by counsel what the defense would be. Id. at 223-27. Accordingly, we conclude that trial counsel made a reasonable strategic decision not to pursue the "economic motive" defense at trial, and we affirm the post-conviction court's denial of relief with respect to this issue.

### III. Severance

The Petitioner contends that trial counsel was ineffective by failing to request a severance of the charges relating to T.B. and S.W. The Petitioner argues that trial counsel's decision was not a reasonable strategic decision because "the defenses for each victim were unrelated." The Petitioner further argues that he was prejudiced by trial counsel's failure to seek a severance "because the jury heard [an] ongoing litany of offenses and likely convicted [him] based on propensity evidence." The State responds that trial counsel made a reasonable strategic decision not to seek a severance. We agree with the State.

This court has previously noted that "astute defense counsel often prefer a joint trial as a matter of strategy." State v. Cook, 749 S.W.2d 42, 46 (Tenn. Crim. App. 1987). Failure to seek a severance is "amenable to attack as being professionally unreasonable"

-18-

if it was not the result of "a well-informed strategic decision." Cauthern v. State, 145 S.W.3d 571, 615 n.6 (Tenn. Crim. App. 2004).

Here, trial counsel hoped "to taint the State's strongest case with . . . [its] weakest case" by having the charges involving T.B. and S.W. tried together. Trial counsel felt confident that he could secure an acquittal from the charges involving S.W. because S.W.'s allegations were "just really preposterous." Trial counsel also noted that the victims were friends, that they were both "interested" in the Petitioner's grandson, and that they both made their allegations at the same time. Trial counsel further believed that S.W. had made changes to her story to make it more similar to T.B.'s allegations. On the whole, trial counsel felt that "the positive aspect[s]" of trying the cases together "outweighed the negative aspect[s] of not severing."

With respect to the Petitioner's propensity argument, we note that the vast majority of the charges involved T.B. S.W. was the victim in only three of the forty-four charges. Again, the Petitioner was acquitted of all of the charges involving S.W. and was acquitted or found guilty of the lesser-included offense of attempt for several of the charges involving T.B. Accordingly, we conclude that trial counsel's decision not to seek a severance was a reasonable strategic decision and that the post-conviction court did not err in denying post-conviction relief on this issue.

## IV. Jury Selection

The Petitioner contends that trial counsel was ineffective in failing to challenge certain jurors during voir dire. The Petitioner argues that "[d]eference should not be given to trial counsel's decision to have an all-female jury." The Petitioner specifically argues that it was ineffective for trial counsel not to challenge two jurors who made regular donations to the CPC and a juror who had a relative who had "allegedly been molested." The State responds that trial counsel's choices during voir dire were reasonable strategic decisions. We agree with the State.

"Despite its significance, a trial lawyer is 'accorded particular deference when conducting voir dire' and his or her 'actions during voir dire are considered to be matter of trial strategy.'" William Glenn Rogers v. State, No. M2010-01987-CCA-R3-CD, 2012 WL 3776675, at *36 (Tenn. Crim. App. Aug. 30, 2012) (quoting Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001)). Therefore, "it is imperative for a petitioner claiming ineffective assistance of counsel during jury selection to demonstrate that the resulting jury was not impartial." Id. (citing Smith v. State, 357 S.W.3d 322, 348 (Tenn. 2011)). Additionally, a panel of this court has previously held that a trial counsel's decision not "to use all of their available peremptory challenges" because they feared "there was a 'substantial chance' they could end up with a less favorable jury" was a reasonable strategic decision when trial counsel had "utilized written questionnaires and

examined each juror individually during voir dire." Jonathan Wesley Stephenson v. State, No. E2012-01339-CCA-R3-PD, 2014 WL 108137, at *31 (Tenn. Crim. App. Jan. 13, 2014).

Here, trial counsel testified that it was uncommon for jury questionnaires to be used "in a rape trial," but that the trial court allowed a questionnaire in this case and that he was able to gain significant information on the potential jurors. Trial counsel and the jury consultant used this information to rank the potential jurors. Trial counsel noted that all of the male jurors that had been challenged by the State had been "ranked at the bottom" of his list of potential jurors. With respect to the two jurors who donated to the CPC, trial counsel testified that it was a popular charity in Jackson and that he believed he had addressed the issue with the jurors during voir dire. Additionally, trial counsel thought that the jurors' "positives would have outranked" the fact that they donated to the CPC. Regarding the other juror, trial counsel testified that he did not challenge her because he was down to his last challenge and he did not want her to be replaced with someone he viewed as a worse potential juror. Furthermore, the juror stated during voir dire that the situation with her relative would not affect her impartiality. As such, the Petitioner has failed to demonstrate that the jury was not impartial. Accordingly, we conclude that this issue is without merit.

### V. The Petitioner's Decision Not to Testify at Trial

The Petitioner contends that trial counsel was ineffective by failing "to call" the Petitioner as a witness at trial. The Petitioner argues that he was the only witness who "could present a full version of his theory of the facts." The State responds that the Petitioner "made his own decision not to testify" after adequately being counselled about the decision by trial counsel.

The Petitioner cites to Zimmerman as the only legal authority to support his argument. However, Zimmerman is inapplicable here because trial counsel had not "let in objectionable prejudicial testimony with the intention of clarifying it with the testimony of the [Petitioner]" and then changed that strategy mid-trial. 823 S.W.2d at 227. Instead, "[t]he decision as to whether an accused should testify at trial rests with the accused, not defense counsel." Vermilye v. State, 754 S.W.2d 82, 88 (Tenn. Crim. App. 1987).

Here, trial counsel testified that he discussed the issue of the Petitioner's testifying at trial with the Petitioner "on various occasions." Trial counsel advised the Petitioner that the decision was not something he should make "spontaneously," but rather that it would "take many hours of preparation" if he chose to testify. Additionally, the jury consultant spoke with the Petitioner about the issue. Trial counsel testified that he did not think it was a good idea for the Petitioner to testify, but that he did not attempt to

-20-

"dissuade" the Petitioner from doing so. Trial counsel further testified that the Petitioner "declined" his pretrial offer to prepare him to testify and that it was the Petitioner's decision not to testify. Additionally, the post-conviction court found that the record reflected that the Petitioner made the decision not to testify at trial. As such, we conclude that this issue has no merit.

## VI. The State's Closing Argument

The Petitioner contends that trial counsel was ineffective for failing to object to the State's references to the term "pedophile" and to Playboy magazines during its closing arguments. The Petitioner argues that the State's referring to the Petitioner as a pedophile was a "propensity argument . . . designed to inflame the passions of the jury." The Petitioner further argues that the reference to the Playboy magazines was designed to be "corroborating evidence that [the] Petitioner was a pedophile" and amounted to the State's arguing "facts not in evidence" because the Petitioner had been acquitted of the charge "which involved the Playboy magazine[s]." The State responds that trial counsel was not ineffective with respect to this issue.

This court has previously considered "whether the failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel." Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010). "The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." Id. Trial counsel could decide not to object for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. Id. (quoting Gregory Paul Lance v. State, No. M2005-01675-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App. Aug. 16, 2006)).

Here, trial counsel's decision not to object to the prosecutor's reference to the Playboy magazines found in the Petitioner's bedroom was a reasonable tactical decision. Trial counsel testified that he did not "think it was prejudicial to [their] case and [he thought it] was relevant" to the State's attempt "to show [T.B.'s] familiarity" with the Petitioner's bedroom. This is consistent with our review of the challenged portion of the State's argument.

Trial counsel testified that he did not notice the State's use of the term "pedophile" during its closing argument and that he should have objected to it. Prosecutors cannot use epitaphs to characterize a defendant. State v. Thomas, 158 S.W.3d 361, 414 (Tenn. 2005). However, comments on a defendant's demeanor that do not otherwise manipulate or misstate the evidence or implicate other rights of the defendant are not improper. State v. Hawkins, 519 S.W.3d 1, 49 (Tenn. 2017) (quoting Thomas, 158 S.W.3d at 414).

-21-

At trial, there was evidence that the Petitioner would pick up T.B. from school and that she referred to the Petitioner as "grandpa." This evidence led to questioning of the expert witnesses on the topic of "grooming" and a discussion of pedophilia. Based upon our review of the record, we do not believe that this argument was improper. See Hawkins, 519 S.W.3d at 49 n.16 (concluding that the prosecutor's referring to the defendant as "mean" was a "strong but fair comment based on the proof" and not an improper argument). Accordingly, we conclude that the post-conviction court did not error in denying post-conviction relief on this issue.

## VII. Lesser-Included Offenses

The Petitioner contends that the trial court erred by failing to instruct the jury on the lesser-included offenses of misdemeanor assault and misdemeanor "child abuse, neglect" and that trial counsel was ineffective for failing to request such instructions. The Petitioner argues that "[t]here was evidence in the record to support such instruction[s]" and that "the jury could have found [him] guilty of these misdemeanor offenses." The State responds that this issue is without merit because "the jury rejected all of the other lesser[-]included offenses it was instructed on [other than attempt] and would not have reached the offenses [the] Petitioner now wishes were included in the instructions."

With respect to this issue, our supreme court has previously explained as follows:

[W]here the jury convicts the defendant of a greater charged offense rather than an immediately lesser offense standing between omitted lesser-included offenses and the offense for which the defendant was convicted, any error from the omission of jury instructions on these other asserted lesser-included offenses is harmless beyond a reasonable doubt because the jury, by finding the defendant guilty of the greater offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses.

Moore v. State, 485 S.W.3d 411, 421 (Tenn. 2016). When this is the case, "any asserted deficiency of trial counsel based on failure to request that particular lesser-included offense instruction can never be prejudicial in a post-conviction proceeding." Id. at 422-23. Here, the Petitioner was convicted of either the charged offenses or attempt. As such, this issue is devoid of merit.

## VIII. The State's Election of Offenses

The Petitioner contends that trial counsel "was ineffective for failing to request that the trial court require the State to make an election of offenses" and "by failing to

object to the trial court judge's election of offenses." The Petitioner argues that the State never made an election of offenses and that the election of offenses in the jury instructions had actually been prepared by the trial court. The State responds that the Petitioner has failed to prove these factual allegations by clear and convincing evidence. We agree with the State.

The post-conviction court concluded that the State had been required to make an election of offenses and that it did so prior to the Petitioner's motion for judgment of acquittal. The post-conviction court clarified a comment from the trial transcript that it had "prepared an election of offenses." The post-conviction court explained that this statement referred to the State's having submitted its election of offenses to be typed for use in the jury instructions. In response to this, the Petitioner's attorney conceded that "the election was made, at least it was charged to the jury." Likewise, trial counsel recalled the trial court "required the State to make an election" of offenses and that the prosecutor "react[ed] as he was . . . obligated to do." Accordingly, we conclude that this issue is without merit.

## IX. Cumulative Error

The Petitioner contends that post-conviction relief is warranted due to the cumulative effect of trial counsel's errors. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). In the post-conviction context, "a petitioner cannot successfully claim he was prejudiced by [trial] counsel's cumulative error when the petitioner failed to show [trial] counsel's performance was deficient." James Allen Gooch v. State, No. M2014-00454-CCA-R3-PC, 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015). The Petitioner has failed to prove that trial counsel was deficient or that he was prejudiced for any of the issues raised in his brief. As such, we conclude that the cumulative error doctrine does not apply to this case.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE